**JOHNNY BLASTOFF, INCORPORATED, Plaintiff–Appellant,**

v.

**LOS ANGELES RAMS FOOTBALL COMPANY, St. Louis Rams Partnership, National Football League Properties, Incorporated, et al., Defendants–Appellees.**

No. 98–2908.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1998.

Decided Aug. 5, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 31, 1999.

John C. Widule (argued), Elm Grove, WI, for Plaintiff–Appellant.

Daniel T. Flaherty, Godfrey & Kahn, Milwaukee, WI, Robert L. Raskoph (argued), Townley & Updike, New York, NY, for Defendants–Appellees.

Before COFFEY, ROVNER and DIANE P. WOOD, Circuit Judges.

COFFEY, Circuit Judge.

On January 17, 1995, St. Louis Mayor Freeman Bosley and Georgia Frontiere, owner of the Los Angeles Rams Football Company ("Rams"), a National Football League professional sports team, announced that the Los Angeles Rams football franchise intended to relocate to St. Louis, Missouri, from Los·Angeles, California. Shortly thereafter, on February 22, 1995, the plaintiff-appellant Johnny Blastoff, Inc. ("Blastoff"), a corporation in the business of creating and marketing cartoon characters, filed a State of Wisconsin trademark application for the name of a separate and distinct, fictional, cartoon sports team, the "St. Louis Rams." On March 10, 1995, Blastoff filed two federal intent-to-use trademark applications for the "St. Louis Rams" mark. One month later, on April 12, 1995, the Rams' move to St. Louis was approved by the National Football League ("NFL"). On March 12, 1997, the plaintiff-appellant Blastoff filed a complaint in the United States District Court for the Western District of Wisconsin, seeking a declaratory judgment

against the defendants-appellees, the Rams, the NFL, National Football League Properties, and the St. Louis Rams Partnership. Specifically, Blastoff sought declarations that: (1) the Rams had engaged in unfair competition, including misrepresenting the registration status of the "St. Louis Rams" mark; and (2) Blastoff did not infringe the NFL defendants' trademark rights. On September 5, 1997, Blastoff filed an amended complaint, seeking $100 million in damages and further declarations of unfair competition, trademark infringement, and cancellation of the Rams' registered trademark for the "Rams" mark. On March 12, 1998, the NFL moved for summary judgment, seeking an order dismissing the First Amended Complaint in its entirety, which the trial judge granted. The judge also granted the NFL's counterclaim for injunctive relief and ordered the State of Wisconsin to cancel Blastoff's registration of the mark "St. Louis Rams." Blastoff appeals. We affirm.

## I. BACKGROUND

The Blastoff corporation was organized under the laws of Wisconsin in 1993. Rodney Rigsby ("Rigsby") is president, chairman of the board, and primary shareholder of Blastoff. The corporation, which is in the business of creating and marketing cartoon characters, is named for Johnny Blastoff, a fictional, animated, cartoon character conceived by Rigsby. Rigsby has developed several other characters in conjunction with the Johnny Blastoff cartoon concept. Blastoff cartoon story lines are set in Tower City, a fictional city that is home to a number of fictional sports teams including the Tower City Rams. Rigsby designed logos for each of the fictional teams.

The NFL is an unincorporated association of member clubs which field professional football teams. The member clubs derive substantial income from admission fees and personal seat licenses, national television and radio broadcast rights, and the sales of jerseys, jackets, and other sports merchandise and memorabilia. Each member club has adopted a team name, as well as symbols, logos, colors, and other identifying marks. Each club's marks have been assigned to the defendant NFL Properties, which licenses other entities to use the marks in merchandising and promotional activities. The Rams football team, which is one of the NFL's oldest member clubs, was founded in 1937 as the Cleveland Rams franchise and moved to become the Los Angeles Rams in 1946.

Beginning in December of 1993 and throughout 1994, newspaper articles in the St. Louis area reported the possibility that the Los Angeles Rams would move to St. Louis. By late 1994, a "St. Louis Rams Fan Club" had been formed by a bartender at a St. Louis sports bar. On January 17, 1995, a press conference was organized in the city of St. Louis by Georgia Frontiere, owner of the Los Angeles Rams club, and St. Louis Mayor Freeman Bosley who announced that the Rams club intended to relocate from Los Angeles to St. Louis. The press conference was covered by local and national media, including sports writers who filed reports which resulted in articles in *USA Today,* the *New York Times,* as well as other news media outlets throughout the country. In fact, in the *New York Times* article, Mayor Freeman Bosley is quoted as saying, "The St. Louis Rams—how sweet it is." The January 18, 1995, edition of the *St. Louis Post–Dispatch* included a sixteen–page pullout section devoted to the Rams football club, the front page of which bore the title "St. Louis Rams." Immediately after the press conference, "personal seat licenses" for Rams football games were made available by the Rams club for sale in the St. Louis area. Licenses, which ranged in price from $250 to $4500, granted holders the right to acquire season tickets for home games in St. Louis at the new domed stadium under construction. By early February of 1995, over 72,000 personal

seat license applications had been received by the Rams organization. Later, newspapers reported that the move would have to be approved by the member clubs of the NFL, and though NFL Commissioner Paul Tagliabue made several public statements expressing some doubt that the move would be approved, NFL owners signed off on and approved the relocation on April 12, 1995. While a number of unlicensed vendors began selling unlicensed merchandise bearing the mark "St. Louis Rams" in January of 1995, officially licensed vendors began using the "St. Louis Rams" mark in a wide variety of merchandise sales in April of 1995. For example, immediately after the owners' vote on April 12, LogoAthletic, a licensee of NFL Properties, shipped officially licensed apparel bearing the "St. Louis Rams" mark to the St. Louis area. On April 26, 1995, NFL Properties filed two trademark applications on behalf of the Rams for the mark "St. Louis Rams."

While the NFL was in the process of approving the Rams' relocation from Los Angeles to St. Louis, on February 22, 1995, Blastoff filed a State of Wisconsin trademark application for the mark "St. Louis Rams." Blastoff received a registration certificate the same day. At the time of the filing, Blastoff claimed that it was unaware of any other entity using the mark "St. Louis Rams." On March 10, 1995, Blastoff filed two federal intent-to-use trademark applications for the mark "St. Louis Rams," accompanied by a ram's head design. Blastoff filed four more federal trademark applications in 1997. In each of the applications, Blastoff stated it was unaware of any other party's right to use the mark in commerce.

Blastoff had extremely limited success selling its "St. Louis Rams" merchandise to the public. In July of 1995, Rigsby sold two T-shirts bearing his "St. Louis Rams" mark. In 1997, Rigsby was arrested for attempting to sell counterfeit "St. Louis Rams" T-shirts outside Camp Randall Stadium in Madison, Wisconsin. On July 1, 1997, the plaintiff's attorney also sold a cigar with a band bearing Blastoff's "St. Louis Rams" mark to a friend at a bar.

The defendants made a number of attempts to protect their "St. Louis Rams" NFL football club mark. In August of 1995, the defendants sent the plaintiff a cease and desist letter concerning its unauthorized use of the "St. Louis Rams" name. The plaintiff responded that its products would not be associated with football or the St. Louis Rams football team. In September of 1997, the defendants sent the plaintiff another cease and desist letter regarding licensing solicitation letters the plaintiff had sent to several major companies in the retailing and entertainment businesses.

On June 18, 1996, the United States Patent and Trademark Office ("PTO") published Blastoff's March 10, 1995, trademark application. In response, the defendants filed a notice of opposition to the trademark application the same day. After conducting discovery concerning the PTO opposition proceeding, Blastoff filed a complaint in the United States District Court for the Western District of Wisconsin. Subsequent to that filing, the second of Blastoff's March 10, 1995, trademark applications was published for opposition, and the defendants again filed a notice of opposition. The PTO suspended all action on all of the plaintiff's and the defendants' applications pending the outcome of this suit.

On March 12, 1998, the defendants moved for summary judgment, arguing that: (1) the Rams had acquired rights in the mark "St. Louis Rams" prior to Blastoff; (2) Blastoff's alleged rights in the mark were based on false and fraudulent claims; (3) Blastoff's marks were likely to be confused with the Rams' marks; (4) Blastoff's marks diluted the distinctive value of the Rams' trademarks; (5) Blastoff lacked standing to bring unfair competition and false advertising claims, and such claims were without merit; (6) the "Rams" mark is not generic; and (7) the Rams'

application to the PTO was based on bona fide use of the "Rams" mark in commerce. Blastoff's response to the motion failed to comply with the court's summary judgment procedures in that Blastoff failed to file a memorandum of law in opposition to the defendants' motion for summary judgment.

On June 24, 1998, the district court granted the defendants' motion for summary judgment ruling, *inter alia*, that: (1) the NFL did not infringe Blastoff's "St. Louis Rams" mark under Wisconsin law; (2) Blastoff infringed the NFL's trademark rights; (3) the NFL did not engage in unfair competition or deceptive advertising; (4) the Rams' federally registered "Rams" mark is not generic; and (5) Blastoff is not entitled to money damages. In addition, the court ordered that Blastoff's Wisconsin registration of the "St. Louis Rams" mark be canceled forthwith.

## II. ISSUES

On appeal, we consider: (1) whether the district court erred in concluding that the NFL defendants had acquired protectable rights in the mark "St. Louis Rams" prior to Blastoff; (2) whether the district court erred in finding a likelihood of confusion exists between the plaintiff's and the defendants' use of the "St. Louis Rams" mark; (3) whether the district court's ruling that Blastoff failed to raise a genuine issue of material fact concerning the shipment of merchandise bearing the "St. Louis Rams" mark on April 12, 1995, was proper; (4) whether the district court's ruling that Blastoff failed to raise a genuine issue of material fact in support of its claim that the "Rams" mark was generic was proper; (5) whether the district court erred in dismissing the plaintiff's unfair competition and deceptive advertising claims due to the plaintiff's lack of standing; and (6) whether the trial judge's determination that she lacked statutory authority to order the PTO to reject applications for the "St. Louis Rams" mark was proper.

## III. DISCUSSION

This Court reviews a district court's grant of summary judgment *de novo*. *See Green v. Shalala*, 51 F.3d 96, 99 (7th Cir. 1995). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See id.* This Court views the record and all reasonable inferences drawn from it in the light most favorable to the non-moving party. *See Hartford Accident & Indem. v. Chicago Hous. Auth.*, 12 F.3d 92, 95 (7th Cir.1993).

### A. Prior Protectable Rights

■ Initially, the plaintiff contends that the district court erred in concluding that the NFL defendants had acquired protectable rights in the mark "St. Louis Rams" prior to Blastoff. In response, the defendants argue that they established prior and superior rights in the "St. Louis Rams" mark through the public use of the mark, third-party promotion and advertising, and the fact that the public associated the mark with the Rams NFL franchise. The trial court, reflecting the defendants' view, stated that "by the time plaintiff filed its Wisconsin registration in February 1995, a substantial portion of the public associated the mark 'St. Louis Rams' with defendants' football club."

■ The determination of whether a party has established protectable rights in a trademark is made on a case by case basis, considering the totality of the circumstances. *See New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1200 (9th Cir.1979). A party may acquire a protectable right in a trademark only through use of the mark in connection with its product. *See Zazú Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir.1992). The party seeking to establish appropriation of a trademark must show first, adoption, and second, "use in a way sufficiently public to identify or distinguish the marked goods in

an appropriate segment of the public mind as those of [the adopter of the mark]." *New West,* 595 F.2d at 1200. The party who first appropriates the mark through use, and for whom the mark serves as a designation of source, acquires superior rights to it. *See Zazú,* 979 F.2d at 503–04. Evidence of actual sales is not necessary to establish ownership. *See New West,* 595 F.2d at 1200. Furthermore, current case law in the area of franchise relocation and expansion has created a strong presumption of franchise owner priority in their marks. In *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd.,* 34 F.3d 410, 413 (7th Cir.1994), this Court held that the "Indianapolis Colts" mark may be viewed simply as "Colts," independent of urban affiliation. While courts consistently define "use" as the public sale of a product, in some circumstances parties have been found to possess rights in an alteration of an existing mark that was used solely by third parties to designate its product. *See Coca–Cola Co. v. Busch,* 44 F.Supp. 405, 409–10 (D.Pa. 1942) ("Coke" protectable trademark for "Coca–Cola"). In addition, advertising and promotion surrounding the development of sports facilities have been found to establish rights in the mark. *See Maryland Stadium Authority v. Becker,* 806 F.Supp. 1236 (D.Md.1992).

On January 17, 1995, Georgia Frontiere, the owner of the Rams, and St. Louis Mayor Freeman Bosley held a press conference at which they announced the Rams' intention to relocate from Los Angeles to St. Louis. The press conference story received extensive national and local press, including the *St. Louis Dispatch's* publication, on January 18, 1995, of a sixteen-page pullout section of the newspaper entitled "St. Louis Rams." Vendors sold unlicensed "St. Louis Rams" merchandise in the St. Louis area in January of 1995, and by February of 1995, more than 72,000 personal seat licenses for the St. Louis Rams' home games had been received. By the time Blastoff registered the "St. Louis Rams" mark in Wisconsin in February of 1995, a significant portion of the public associated the mark with the Rams football club. However, Blastoff asserts that the defendants had not sufficiently used the mark "St. Louis Rams" to be given priority. Blastoff argues that at the January 17, 1995, press conference, none of the defendants used the words "St. Louis Rams," and thus, this term was rendered an "unarticulated idea for a team name," which is not protectable. Blastoff also states that newspaper and media coverage is insufficient to establish priority. Finally, Blastoff contends that the football club "operated publicly and exclusively as [the] 'L.A. Rams' " as late as February 8, 1995.

■ For the purpose of establishing public identification of a mark with a product or service, the fact-finder may rely on the use of the mark in "advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications," *T.A.B. Systems v. Pactel Teletrac,* 77 F.3d 1372, 1375 (Fed.Cir.1996), as well as in media outlets such as television and radio. *See In re Owens–Corning Fiberglas Corp.,* 774 F.2d 1116, 1125 (Fed.Cir.1985). In addition, courts have recognized that "abbreviations and nicknames of trademarks or names used *only* by the public give rise to protectable rights in the owners of the trade name or mark which the public modified." *Nat'l Cable Television Assoc. v. Am. Cinema Editors, Inc.,* 937 F.2d 1572, 1577 (Fed.Cir.1991). Such public use of a mark is deemed to be on behalf of the mark's owners. *See id.* Blastoff has failed to demonstrate any equivalent use of the mark "St. Louis Rams" by February of 1995, when the defendants established, by use and public association, their priority in the mark. Blastoff's insignificant and very limited use of the mark prior to February of 1995, consisting of the development of the "Tower City Rams" design, along with the production of a swatch of material with "St. Louis Rams" embroidery, is insufficient to establish a link between the mark and its products. Furthermore, the owner's use of a trademark is relevant in

establishing public identification of a mark with a product or service. Georgia Frontiere, owner of the Rams, in announcing her intention to move the franchise to St. Louis from Los Angeles, implicitly adopted the exact phrase "St. Louis Rams" on the date of her press conference. This Court's decision in *Indianapolis Colts* is strong support for the proposition that the Rams organization and the NFL had a long-established priority over the use of the "Rams" name in connection with the same professional football team, regardless of urban affiliation. Similar to the case under consideration, in *Indianapolis Colts*, 34 F.3d at 413, we held that the team's move from Baltimore to Indianapolis

> neither broke the continuity of the team in its different locations—it was the same team, merely having a different home base and therefore a different geographical component in its name—nor entitled a third party to pick [the name] up and use it to confuse Colts fans.... When [the owner] transported his team, the Baltimore Colts, from Baltimore to Indianapolis in one night in 1984, the team remained, for a time anyway, completely intact: same players, same coaches, same front-office personnel.

Similarly, Blastoff's filing of federal trademark applications in March of 1995 fell short of establishing his priority in the marks, even though the Rams in fact did not file their trademark application until April of 1995, as a trademark application is always subject to previously established common law trademark rights of another party. *See The Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 672 (7th Cir.1982) (quoting McCarthy, *Trademarks and Unfair Competition* § 19:2, at 656). Furthermore, because a product or organization may be designated by more than one trademark, *see Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co.*, 477 F.2d 150, 154 (6th Cir.1973), it is irrelevant, as the plaintiff suggests, that the official name of the Rams remained "Los Angeles Rams" until April of 1995. Thus, we agree with the district court's determination that the defendants-appellees had acquired protectable rights in the "St. Louis Rams" mark prior to Blastoff.

### B. Likelihood of Confusion

 The plaintiff next contends that the district court erred in finding a likelihood that confusion exists between Blastoff's and the defendants' use of the "St. Louis Rams" mark. Blastoff's rationale for raising this issue is unclear from its brief, but it seems Blastoff wishes to challenge the district court's determination that Blastoff is not entitled to a declaration that it did not infringe on the Rams' mark. Although the defendants did not assert an infringement counterclaim at trial, the defendants respond by contending that the plaintiff's past and proposed future use of the "St. Louis Rams" mark infringes upon their common law rights in the mark.

Infringement of unregistered marks is actionable under the Lanham Act, 15 U.S.C. § 1125(a), which provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination hereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A) is likely to cause confusion, or to cause mistake or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Such a claim requires a showing that: (1) the defendants have a protectable trademark; and (2) a "likelihood of confusion" will exist as to the origin of the plaintiff's products. *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir.1988).

"Whether or not there is a likelihood of confusion is a question of fact as to the probable or actual actions and reactions of prospective purchasers of the goods or services of the parties." *Id.* at 1087. The district court's determination on this issue amounts to a finding that, even resolving all of the factual disputes referred to in the record in favor of Blastoff, a likelihood of confusion would still exist as a matter of law. *See Hartford Accident & Indem.*, 12 F.3d at 95. This Court reviews this legal conclusion *de novo*. *See Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 952 (7th Cir.1992). In determining whether a likelihood of confusion exists, this Court considers seven factors, weighing their relative importance on a case-by-case basis. *See id.* at 959. These factors are: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the complainant's mark; (6) actual confusion; and (7) intent of the infringing party to "palm off" his product as that of the other party. *See Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1216 (7th Cir.1997).

In the trial court, the plaintiff Blastoff did not contest that a likelihood of confusion existed, asserting that it believed the public associated the plaintiff's apparel and sundries with the Rams football club. On appeal, Blastoff changes its focus and now blames the defendants for having caused a likelihood of confusion to exist. Initially we note that

> [t]his Court has repeatedly held that "the appellant's waiver of [an] argument through his failure to raise a timely

objection ... makes it unnecessary for [the reviewing court] to decide [the issue]." *United States v. Pryor*, 957 F.2d 478, 481 (7th Cir.1992). Such an objection must "alert [ ] the court and opposing party to the specific grounds for the objection." *United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir.1988) (citations omitted).

*United States v. Krankel*, 164 F.3d 1046, 1052 (7th Cir.1998). Because Blastoff failed to assert that the defendants caused confusion at trial, our review is for plain error. *See id.*

The "keystone" of trademark infringement is "likelihood of confusion" as to source, affiliation, connection or sponsorship of goods or services among the relevant class of customers and potential customers. Usually, the confusion alleged is "forward confusion," which occurs "when customers mistakenly think that the junior user's goods or services are from the same source as or are connected with the senior user's goods or services." In such a case, the junior user attempts to capitalize on the senior user's good will and established reputation by suggesting that his product comes from the same source as does the senior user's product. *Big O Tire Dealers v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365 (10th Cir.1977). In this case, however, [the plaintiff] relies not on classic forward confusion but on the doctrine of "reverse confusion." Reverse confusion occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user. In such a case, the junior user does not seek to profit from the good will associated with the senior user's mark. Nonetheless, the senior user is injured because

> [t]he public comes to assume that the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark—its

product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

*Ameritech, Inc. v. American Information Technologies Corp.*, 811 F.2d 960, 964 (6th Cir.1987); *see also Banff, Ltd.*, 841 F.2d at 490–91; *Big O Tire Dealers*, 561 F.2d at 1372.

*Sands, Taylor & Wood*, 978 F.2d at 957 (citations omitted). In asserting that the defendants are the cause of confusion of the marks, the plaintiff seems to be framing the issue as one of reverse confusion. Thus, the plaintiff argues that the large junior user, the NFL, is saturating the market with a trademark similar or identical to that of the smaller, senior user, Blastoff. *See id.* This argument falls short because, as set forth above, Blastoff is not the senior user and furthermore has no protectable rights to the "St. Louis Rams" mark. Blastoff's own statement, that the public associated the plaintiff's apparel and sundries with the St. Louis Rams football club, compels the conclusion that the district court did not err in finding that a likelihood of confusion of the parties' marks exists.

## C. Shipment of Merchandise

The plaintiff next argues that the trial court erred in ruling that Blastoff failed to raise a genuine issue of material fact concerning the shipment of LogoAthletic merchandise bearing the Rams' "St. Louis Rams" mark on April 12, 1995. Blastoff seems to contend that because the defendants were unable to produce an actual specimen of apparel bearing the "St. Louis Rams" mark which was shipped to the St. Louis area on April 12, 1995, the trial court should have ruled that the defendants produced no evidence of their use of the mark in commerce by that date. The plaintiff argues that the failure to produce the actual shirt "gives rise to an inference adverse to the party failing to produce the original." The trial judge rejected the plaintiff's argument, determining that Blastoff failed to estab-lish a genuine issue of material fact as to the propriety of the shipment date because the defendants had submitted evidence of such use including affidavits, testimony, and a photograph of the shirt.

The defendants submitted a federal application for the "St. Louis Rams" mark on April 26, 1995. The application stated that the defendants' first use of the mark in commerce was on April 12, 1995, the date on which LogoAthletic, an official NFL licensee, shipped apparel bearing the "St. Louis Rams" mark to the St. Louis area. Accompanying the application was a photograph of a shirt bearing the word mark "St. Louis Rams." The defendants have provided additional support for the claims made on the applications by way of the affidavit testimony of James P. Connely, who served as Senior Vice President of Consumer Products for National Football League Properties in 1995. Connely stated that he had personal knowledge of the shipment, and his testimony corroborates the defendants' contention that the merchandise was shipped on April 12, 1995. The plaintiff's only "support" for its conclusion that the defendants' evidence is insufficient to establish the defendants' use in commerce is a citation to the PTO's Trademark Manual of Examining Procedure § 905.03, which outlines procedures for the PTO's disposal of bulky specimens received with trademark applications. The plaintiff's "support" for its contention is irrelevant to the issue under consideration, and contrary to the plaintiff's claim, the defendants have proffered several exhibits establishing their use of the mark in commerce. Thus, we are in agreement with the district court's ruling that the plaintiff failed to raise a genuine issue of material fact as to this question.

## D. Generic Marks

The plaintiff also contends that the district court erroneously ruled that Blastoff failed to raise a genuine issue of material fact in support of its claim that

the "Rams" mark was generic. Specifically, Blastoff claims that because the Colorado State Rams college football team uses the team name "Rams," the mark has become generic and the defendants have lost their rights in the mark. In making the claim that the "Rams" mark is generic, Blastoff relies on 15 U.S.C. § 1064(3), which provides that a federal trademark registration that has been on the registry for more than five years can be canceled in circumstances where the mark has become "the generic name for the goods or services, or a portion thereof, for which it is registered." The district court found Blastoff's argument on this point "laughably deficient," ruling that the plaintiff failed to produce "any facts supporting its challenge to [the] registration."

■ A term may be considered generic if it "is one that is commonly used to name or designate a kind of goods," *Mil–Mar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153, 1157 (7th Cir.1996), or it represents the common linguistic usage for such goods. *See Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 905 (7th Cir.1983). The defendants' mark registration specifies that the "Rams" name is to be used for "entertainment services—namely, professional football exhibitions." Thus, the product denoted by the "Rams" registration is a professional football team, and the record is devoid of any evidence demonstrating that any other professional football team is known as the "Rams," with the exception of the now extinct "Los Angeles Rams" franchise. The plaintiff has also failed to adduce any evidence that the "Rams" mark has become a common term for professional football teams generally. *See Henri's Food Prods. Co. v. Tasty Snacks, Inc.*, 817 F.2d 1303, 1305 (7th Cir.1987). Contrary to the plaintiff's claim, use of the "Rams" mark by one, or even several, college athletic teams does not establish a genuine issue as to the mark having become generic as it is defined by the statute because none of the collegiate parties using the mark produces the same product: a professional football team. Furthermore, the record fails to demonstrate that "Rams" is the common linguistic term for a professional football team. *See Gimix*, 699 F.2d at 905.

### E. Unfair Competition and Deceptive Advertising

■ The plaintiff also contends that the district court erred in dismissing its unfair competition and deceptive advertising claims due to the plaintiff's lack of standing. Specifically, the plaintiff contends that in seeking to prevent Blastoff from using the "St. Louis Rams" mark, the defendants marketed football paraphernalia with notices attached which stated that the "Rams" mark was registered with the PTO, and this somehow amounted to deceptive advertising.

In determining that Blastoff lacked standing, the district court ruled that under section 43(a) of the Lanham Act, 15 U.S.C. § 1125, which governs unfair competition and false advertising claims, a party must demonstrate that it "has a reasonable interest to be protected against conduct violating the Act." *Dovenmuehle v. Gilldorn Mortgage Midwest Corp.*, 871 F.2d 697, 700 (7th Cir.1989). A party bringing suit must assert "a discernable competitive injury." *L.S. Heath & Son, Inc. v. AT&T Info. Sys. Inc.*, 9 F.3d 561, 575 (7th Cir.1993).

In our consideration of prior protectable rights, we determined that the NFL has established superior rights to the "St. Louis Rams" mark. As such, under the common law, Blastoff, which has never been part of the NFL in any manner, shape, or form, is precluded from using the "St. Louis Rams" mark, and Blastoff therefore has neither a reasonable interest in a right to be protected by bringing suit, *see Dovenmuehle*, 871 F.2d at 700, nor can Blastoff assert a discernable competitive injury in a right. *See L.S. Heath & Son*, 9 F.3d at 575. Therefore, we agree with the district court's determination that Blastoff

lacked standing to bring suit under section 43(a) of the Lanham Act.

### F. Authority Over the PTO

■ The plaintiff also contends that the trial court erred in determining that it lacked statutory authority to order the PTO to reject applications for the "St. Louis Rams" mark. At trial, each party requested that the district court order the PTO to reject the other party's "St. Louis Rams" application. The defendants argued that 15 U.S.C. § 1119 provides the trial court with the necessary power to do so. Section 1119 provides that "[i]n any action involving a registered mark the court may determine the right ... to the registrations of any party to the action."

On appeal, the defendants now contend that the trial court properly determined that it lacked statutory authority. On the other hand, Blastoff seems to challenge the trial court's determination that it lacked statutory authority to order the PTO, but provides no factual or legal support. Federal Rule of Appellate Procedure 28(a)(9)(A) provides that all arguments on appeal must be supported by "citations to the authorities and parts of the record on which the appellant relies." This Court has previously refused to consider unsupported or cursory arguments, *see United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991), and we refuse to make any exceptions in this case. Because the plaintiff has failed to adequately challenge this issue on appeal, we need not reach a conclusion concerning the trial court's authority to order the PTO to reject trademark applications.

### G. Miscellaneous Contentions

■ Finally, Blastoff raises a number of unconventional responses to the defendants' motion for summary judgment and to the district court's ruling. Blastoff contends that, despite not following the written procedures of the Western District of Wisconsin regarding motions for summary judgment, the district court abused its discretion in denying both Blastoff's Motion for Leave to File Opposition to Summary Judgment in Format as Filed Herewith and its Motion for Leave to File a Surreply and Statement of Supplemental Authorities.

■ This Court, along with the other twelve circuits, has in the past recognized and will continue to recognize the importance of enforcing its procedural rules for filing and responding to motions for summary judgment; if we did not, we would essentially be left with a court in chaos. An entry of summary judgment will be sustained "where the nonmovant has failed to submit a factual statement *in the form called for by the pertinent rule* and thereby conceded the movant's version of the facts," if on the basis of the factual record the movant is entitled to judgment as a matter of law. *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 286 (7th Cir.1997) (emphasis added). Blastoff's attorney was and should have been aware of both the local rules and the district court's intention to uphold them. The district court did not abuse its discretion in denying the motions.

■ Similarly, Blastoff's contention that the district court erred in denying its Motion for Reconsideration, Amendment, or Vacatur of its June 24 opinion is without merit. A motion for reconsideration "allows a party to direct the district court's attention to newly discovered material evidence or a manifest error of law or fact." *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir.1996). The motion for reconsideration is not an opportunity for a party to correct its own procedural failures or introduce evidence that should have been brought to the attention of the court prior to judgment. *See id.* Blastoff has failed to demonstrate that the district court's opinion is inadequate or erroneous, and thus, the district court did not abuse its discretion in denying the motion.

The final issue on appeal concerns Blastoff's perception that the district court

failed to consider Blastoff's evidence in rendering its opinion. This argument will not be addressed substantively, as Blastoff did not even attempt to support its contention with argument in its brief. *See Berkowitz*, 927 F.2d at 1384.

### IV. CONCLUSION

The district court did not commit error in granting the defendants' summary judgment motion.

AFFIRMED.