In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-3337

S.C. JOHNSON & SON, INC.,

*Plaintiff-Appellee,*

*v.*

NUTRACEUTICAL CORPORATION and
NUTRAMARKS, INC.,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 11-C-861 — **Rudolph T. Randa**, *Judge.*

ARGUED APRIL 12, 2016 — DECIDED AUGUST 25, 2016

Before WOOD, *Chief Judge,* and FLAUM and WILLIAMS, *Circuit Judges.*

WOOD, *Chief Judge.* This case is the story of two roads, which, unlike those in the Robert Frost poem, converged in a lawsuit. See ROBERT FROST, *The Road Not Taken, in* MOUNTAIN INTERVAL 9 (1916). Almost thirty-five years ago, Sandy Maine came out of the backwoods and entered the business of natu-

ral insect repellants. She marketed and distributed her products under the mark "BUG OFF" through a company called Sunfeather. Although her products were commercially successful, she never registered the mark. This became a problem in 1998, when Melvin Chervitz registered it. It became a much bigger problem in 2011, when S.C. Johnson & Son, Inc., which had acquired the Chervitz registration, sued Nutraceutical (Sunfeather's successor-in-interest) for trademark infringement.

Nutraceutical defended on the ground of prior and continuous use. From the time the pleadings were filed through the trial, the parties all agreed that the period in dispute was before 1998. But the earth underneath Nutraceutical shifted after the district court requested post-trial briefing in lieu of closing argument. For the first time, S.C. Johnson argued that Nutraceutical had failed to prove continuous use of the mark *after 2012*. The district court was persuaded that this was true and ruled in S.C. Johnson's favor, granting a permanent injunction against Nutraceutical's use of the mark and ordering it to destroy all unauthorized products. Nutraceutical appeals, arguing that the district court erred in declining to find S.C. Johnson's winning argument estopped or waived. Meanwhile, S.C. Johnson contends that the district court clearly erred in finding that Nutraceutical established continuity of use before 2012; the alleged lack of continuity, it says, provides an alternate ground for the injunction.

## I

In 1979, Sandy Maine founded Sunfeather as a sole proprietorship in Potsdam, New York. In the early 1980s, while working as an Adirondack wilderness guide, she developed and bottled an all-natural bug repellant under the mark "BUG

OFF." She did not do any trademark searches before choosing the mark. In the early 1980s, Maine gave the bug repellant to some of her wilderness-guide clients for trial on the trail. The reviews came back from beyond the treeline: she had a hit on her hands among the GORP-and-granola crowd. She began selling her BUG OFF through the Potsdam Consumer Co-Op.

In 1992, Maine and Sunfeather began marketing and selling BUG OFF repellant at twice-yearly craft fairs in Maryland, West Virginia, and Virginia. The fairs each drew 30,000–60,000 attendees from around the region. Sunfeather also began selling BUG OFF through its own wholesale catalog and website around this time. The next year, Sunfeather marketed BUG OFF at trade shows in New York, Arkansas, Atlanta, California, Chicago, Denver, Miami, New York City (including at the New York International Gift Fair, now called NY NOW, see www.nynow.com), Ohio, Philadelphia, Seattle, and Tennessee. From 1992 to 1997, Sunfeather offered BUG OFF at between 24 and 40 trade shows per year. It also developed a catalog, which it distributed at trade fairs, and a website. Between 1992 and 1998, Sunfeather printed between 5,000 and 20,000 copies of its catalog per year. During this period, Sunfeather took orders for BUG OFF from every state in the union.

In 1994, Sunfeather was pleased when Smith & Hawken, a national gardening retailer, chose to carry Sunfeather's BUG OFF products in its catalog and stores. Although those products were featured in Smith & Hawken's brick-and-mortar stores only through 1996, they stayed in its catalog until 2004. Smith & Hawkin's catalog had a circulation of more than 200,000. To stay in the catalog, BUG OFF had to sell more than 700 units per season. Sunfeather made it into

Frontier Natural Products Co-op, another catalog, starting in 1997. Frontier's catalog was distributed to roughly 15,000 wholesalers, and featured Sunfeather's BUG OFF products until 2007. By 1998, Sunfeather had more than $1 million in sales per year; BUG OFF products represented roughly 15 percent of the total.

The second road entered the picture on June 22, 1998, when Chervitz filed an application for the BUG OFF trademark. His application stated that the mark was first used in commerce on January 26, 1998. Just over two years later, on July 25, 2000, the U.S. Patent and Trademark Office (PTO) registered Chervitz's mark. Six days after Chervitz's application, on June 28, 1998, DeJay Corporation submitted an intent-to-use application to register BUG OFF. Later that summer, DeJay was acquired by Kaz, Inc. In 1999, Kaz sold millions of BUG OFF wristbands throughout the United States.

In 2001, apparently unaware of its competition for the mark, Sunfeather added several products to its BUG OFF line of natural insect repellants, including a balm, spritzer, soy candle, and soap and shampoo bar. Meanwhile, Kaz attacked Chervitz's registration: in January 2001, it petitioned to cancel the Chervitz registration for lack of actual use in commerce.

In December 2002, Sunfeather filed three applications to register the BUG OFF mark. The PTO refused them based on the Chervitz and Kaz registrations, and the PTO's Trademark Trial and Appeal Board affirmed over Sunfeather's protest that its goods were different from those offered by Chervitz and Kaz. Sunfeather did not at that point assert that it owned trademark rights predating the Chervitz and Kaz registrations.

On January 29, 2003, S.C. Johnson entered the picture, filing an intent-to-use application for various bug repellant products using the BUG OFF mark. On June 23, 2003, S.C. Johnson and Sunfeather's paths momentarily crossed: S.C. Johnson received a letter from Sunfeather's attorney expressing concern over the application and informing it that Sunfeather had been using the BUG OFF mark since at least 1992. The letter asked several questions intended to reveal whether there would be a likelihood of confusion if S.C. Johnson's application was granted. In response, S.C. Johnson's corporate counsel for pest control called Sunfeather's attorney and told her that Sunfeather was infringing on another of S.C. Johnson's trademarks: the "OFF!" label. Sunfeather's attorney promised to review the company's rights and respond, but never followed up. In July 2003, the PTO refused S.C. Johnson's application to register "BUG OFF," based on likelihood of confusion with the Chervitz registration and Kaz application. Meanwhile, in April 2004, the Kaz-Chervitz battle was settled: Chervitz assigned his rights and registration in BUG OFF to Kaz.

In 2005, S.C. Johnson began a campaign against Kaz's registration of the BUG OFF mark. First, on July 22, it filed a petition against Kaz for cancellation of the Chervitz registration. Then, on October 25, it opposed Kaz's application for its own registration. The Kaz application nevertheless advanced to registration in 2007. Finally, on January 18, 2007, S.C. Johnson and Kaz settled. Kaz assigned its rights in the Chervitz and Kaz registrations to S.C. Johnson for $1.1 million. S.C. Johnson then licensed the Chervitz registration back to Kaz royalty-free until December 31, 2009. In 2008, S.C. Johnson conducted a focus group for an insect

repellant wristband concept and prototype, but it did not develop the potential product further.

In March 2010, S.C. Johnson began using the BUG OFF mark, placing it on nine and 11 oz. cans of "OFF! Deep Woods" spray. This represented two of S.C. Johnson's 12 to 15 insect repellant products. The mark appeared—and continues to appear—on the back of the can, next to the OFF! mark. On August 4, 2010, an S.C. Johnson in-house paralegal advised S.C. Johnson that it should "keep using these [wristbands] in order to keep the registration [for wristbands for repelling insects] active."

In February 2011, Sunfeather sold its assets (including the BUG OFF mark rights) to Nutraceutical for $285,000. While Sunfeather still manufactures BUG OFF soap, Nutraceutical makes all other Sunfeather BUG OFF products.

On May 17, 2011, S.C. Johnson's application for a BUG OFF trademark for insect repellants finally advanced to registration. That August, in an internal S.C. Johnson email, an employee recommended adding the mark to insect repellant candles, pads, lamps, and candle lanterns to protect the BUG OFF mark for those products. In the meantime, Nutraceutical continued to sell and distribute Sunfeather-branded BUG OFF bug repellant soap, herbal oil, spritzer, and balm.

In September 2011, S.C. Johnson sued Nutraceutical for trademark counterfeiting, trademark infringement, false designation of origin, unfair competition under federal law, and unfair competition under Wisconsin law. Nutraceutical denied wrongdoing, alleged that it was the senior user of the BUG OFF mark, and asserted several counterclaims. In late

2013, the scope of the case took shape. According to the pretrial report, Nutraceutical relied on a prior-and-continuous use defense, while S.C. Johnson maintained that Nutraceutical could not "establish prior good faith use … before June 22, 1998."

At the conclusion of the two-day bench trial, the district court requested post-trial briefs instead of oral argument. It was in that brief that S.C. Johnson for the first time asserted that Nutraceutical had failed to prove continuous use after 2012. The district court accepted that dramatic shift in focus, finding that while Nutraceutical had proved that "it was the senior user of the BUG OFF mark and it was using the mark nationally from … [April 10, 1995] until June 22, 1998," and continued sales through 2012, it did "not demonstrate continued sales after 2012, which constitutes non-use for more than one year." Based on this finding, the district court held that Nutraceutical had failed to prove its prior-and-continuous use defense and was liable for infringement on S.C. Johnson's trademark.

Nutraceutical filed a motion to alter the judgment. The motion argued, in relevant part, that (1) evidence of sales was unnecessary to prove continuous use, and Nutraceutical had provided undisputed evidence of continuous, nationwide use after 2012; (2) the district court committed legal error by requiring Nutraceutical to provide sales records to show continuous use, which Nutraceutical had otherwise proved; and (3) the district court erred when it did not estop S.C. Johnson from presenting its argument about post-2012 continuous use. The district court denied the motion, and Nutraceutical appealed.

## II

It is a "bedrock principle[] of trademark law" that trademark ownership "is not acquired by federal or state registration," but rather "from prior appropriation and actual use in the market." *Allard Enterprises, Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 356 (6th Cir. 1998) (quoting *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1105 (6th Cir. 1991)). To that end, "[r]egistration itself establishes only a rebuttable presumption of use as of the filing date." *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 504 (7th Cir. 1992). "[A] trademark application is always subject to previously established common law trademark rights of another party." *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 435 (7th Cir. 1999).

Under 15 U.S.C. § 1115(b)(5), a party rebuts that presumption by proving that the mark "was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to … the registration of the mark." This defense is limited to "the area in which such continuous prior use is proved." *Id*. To establish appropriation, a party "must show first, adoption, and second, 'use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" *Johnny Blastoff*, 188 F.3d at 433–34 (quoting *New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1200 (9th Cir. 1979)). This appeal centers on whether Nutraceutical adequately proved this defense.

In determining whether a party has established rights in a trademark, we take into account all relevant facts—the total-

ity of the circumstances, as it is usually put. "Evidence of actual sales is not necessary to establish ownership." *Id*. at 434 (citing *New West*, 595 F.2d at 1200). A wide variety of sources may demonstrate "use" sufficient for public identification of a mark, including "advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications, as well as in media outlets such as television and radio." *Id*. (citations omitted). So long as the trademarked goods or services are actually provided through or in connection with it, "a website that bears a trademark may constitute a *bona fide* use in commerce." *Specht v. Google Inc.*, 747 F.3d 929, 934–35 (7th Cir. 2014) (citing *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211 (11th Cir. 2008)).

Ownership and notoriety are two different things. Thus, to prove ownership, a party need not show that the item in question has gained wide public recognition. *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265 (5th Cir. 1975). "It is enough … if the article with the adopted brand upon it is actually a vendible article in the market, with intent by the proprietor to continue its production and sale. It is not essential that its use has been long continued, or that the article should be widely known, or should have attained great reputation." *Kathreiner's Malzkaffee Fabriken Mit Beschraenkter Haftung v. Pastor Kneipp Med. Co.*, 82 F. 321, 326 (7th Cir. 1897); see also *Sheila's Shine Products, Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 123 (5th Cir. 1973) ("The mere fact that a business is small and its trade modest does not necessarily militate against its being an established business capable of acquiring goodwill and rights in a trademark."(citing *Kathreiner's, supra*)); *Blue Bell*, 508 F.2d at 1265 (noting that a "single use in trade may sustain trademark rights if followed by continuous commercial utilization"); *Allard Enterprises*, 146 F.3d at 358 (same).

A

We might not be here if the district court had not unexpectedly allowed S.C. Johnson to shift its focus at the eleventh hour to the question whether Nutraceutical proved continuous use of BUG OFF products after 2012. We thus turn immediately to the question whether the court abused its discretion in doing so. See *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 795 (7th Cir. 2013). We evaluate *de novo* the related question whether S.C. Johnson waived this argument. *RK Co. v. See*, 622 F.3d 846, 850 (7th Cir. 2010).

Nutraceutical accuses S.C. Johnson of pulling off a bait-and-switch maneuver, and that is just what it did. First, S.C. Johnson admitted, in numerous pretrial filings, Nutraceutical's continuous use of the BUG OFF mark from at least June 1998 through the present. Then, in its post-trial filing, it argued for the first time that Nutraceutical had failed to prove that its use of the BUG OFF mark was continuous from 2012 to the present.

In its complaint, S.C. Johnson alleged that Nutraceutical owned and operated Sunfeather.com, which "advertises and offers for sale numerous insect repellant products under the Infringing BUG OFF mark." Nutraceutical admitted this allegation. Nutraceutical produced sales records showing continuous nationwide sales through 2012 during fact discovery. Later, when S.C. Johnson moved for summary judgment, it stated as an undisputed fact that "Nutraceutical Corporation has continued selling products produced by SunFeather, including Bug Off insect repellants." (Indeed, Nutraceutical had said the same in its complaint.) In Nutraceutical's opposition to summary judgment, it identified as undisputed the fact that since February 2011, Nutraceutical "distributes" BUG

OFF products online and "at retail shops around the country." It also stated that "Nutraceutical sales records demonstrate continued sale of Sunfeather BUG OFF … through [the] present." In its response, S.C. Johnson acknowledged these facts as undisputed, though "immaterial."

S.C. Johnson listed the issues for trial in its pretrial report. They all related to whether Nutraceutical could "establish prior good faith use … before June 22, 1998." While S.C. Johnson mentioned continuity of use, it was only with regard to the period "prior to June of 1998." Nowhere did it mention continuous use post-2012. Nor did Nutraceutical's pretrial report bring up post-2012 continuous use. In its order denying S.C. Johnson summary judgment, the district court noted as a fact that "sales records demonstrate continued sale of Sunfeather BUG OFF, from the time of acquisition to the present." Although S.C. Johnson challenged Nutraceutical's continuity and amount of sales in general during its opening statement at trial, at no point did it challenge its use of the mark post-2012.

Fact 85 of Nutraceutical's post-trial proposed findings of fact was practically a copy-paste of the allegations and summary judgment facts that S.C. Johnson had twice previously admitted. Nutraceutical must therefore have felt bushwhacked when it read S.C. Johnson's response. There, S.C. Johnson for the first time asserted that "there is no testimonial evidence supporting continuous use" (a false statement), and that Nutraceutical "submitted documentary evidence of sales … only for 2011 and 2012, not for 2013 and 2014." The district court accepted these assertions and, relying on them, granted judgment for S.C. Johnson.

S.C. Johnson contends that Nutraceutical was on notice that it would have to prove continuity between 2012 and the present because S.C. Johnson was challenging its continuity of use generally, and because it mentioned recent sales in its opening argument. It also says that a challenge to post-2012 continuity was "subsumed in and implicit in the issues" in its pretrial report.

This will not do. S.C. Johnson's issues for trial not only failed to allude to the post-2012 period, but also expressly stated that they were limited to the pre-1998 period. If S.C. Johnson meant to include the post-2012 period, its statements did not convey that fact—indeed, they were misleading. Because issues for trial are ordinarily limited to those disputed at summary judgment, any reasonable litigant would have assumed that it was not required to prove post-2012 continuity at trial. In its summary judgment response, S.C. Johnson specifically took the position that Nutraceutical's post-2012 facts were immaterial. By that time, it had already twice admitted the very facts it disputed for the first time post-trial, after the presentation of evidence had concluded, when Nutraceutical had no chance to respond.

S.C. Johnson also argues that its own admissions were not sufficient to establish Nutraceutical's continuity of use after 2012. Sales sufficient for use, it argues, are not the same as sales sufficient for infringement. This would be a closer call if it mattered, but it does not. The evidence at trial, coupled with the admissions, is sufficient to show use. Moreover, read in conjunction with S.C. Johnson's pretrial report, the admissions deceptively described the scope of the issues for trial.

Whether we use the theory of waiver or estoppel, the result is the same: S.C. Johnson raised its argument about post-

2012 continuity too late. Nutraceutical was entitled to rely on S.C. Johnson's admission of the facts necessary to establish Nutraceutical's post-2012 continuous use. S.C. Johnson also affirmatively misled Nutraceutical about the scope of trial, and then struck only after Nutraceutical could no longer present relevant evidence. We cannot permit it to profit from this tactic. The district court abused its discretion in allowing S.C. Johnson to argue that Nutraceutical failed to prove continuous use post-2012.

B

Our holding that S.C. Johnson is estopped from relying on the argument that prevailed in the district court is sufficient to sustain our disposition of this case. For the sake of completeness, however, we add a few words about the merits. In short, even if we did not think S.C. Johnson's argument estopped, our result would be the same: the district court committed reversible error in finding that Nutraceutical failed to prove continuous use after 2012.

The parties dispute the standard of review under which this conclusion should be evaluated. Nutraceutical argues that the district court applied the wrong legal standard, and thus that we must approach the case *de novo*. *Morisch v. United States*, 653 F.3d 522, 528 (7th Cir. 2011). S.C. Johnson counters that the district court's conclusion was actually an application of law to fact, which is reviewed for clear error. *Id*.

We agree with Nutraceutical. The district court relied exclusively on Nutraceutical's lack of sales records proving sales after 2012, but "[e]vidence of actual sales is not necessary to establish ownership." *Johnny Blastoff*, 188 F.3d at 434. Even if we characterized this as a ruling on a mixed question, it was

clearly erroneous. In focusing exclusively on the Sunfeather sales records, the district court missed the forest while looking for one specific kind of tree. In fact, the record *does* contain evidence of sales after 2012. On cross-examination, Nutraceutical's Executive Vice President testified that since 2011 Nutraceutical had sold BUG OFF products, and continued to do so through the commencement of the lawsuit. He also testified that Maine still "manufactures the soap under the Sun-Feather line," and that Nutraceutical subsidiaries "manufacture[] the BUG OFF repellant." Although BUG OFF products were no longer listed in Smith & Hawken and Frontier's catalogs, they continued to be available for purchase on the Sunfeather website. These facts are sufficient in themselves to establish continuous use after 2012. S.C. Johnson admitted as much in its summary judgment response, where it said that Nutraceutical "distributes" BUG OFF products online and "at retail shops around the country," and that "Nutraceutical sales records demonstrate continued sale of Sunfeather BUG OFF … through [the] present."

S.C. Johnson protests that even if these facts are sufficient to establish continuous use, they are insufficient to establish *national* use after 2012. It points to Sunfeather's relatively low sales numbers through 2012. But Nutraceutical did not have to show either a high volume of sales or widespread recognition. See *Kathreiner's*, 82 F. at 326. Courts do not examine public sales because they want to know if a mark is dominant in a market, but rather because "[p]ublic sales let others know that they should not invest resources to develop a mark similar to one already used in the trade." *Zazu Designs*, 979 F.2d at 503. With this concern in mind, the fact that BUG OFF products continued to be featured and sold on the Sunfeather website is particularly instructive: if other producers wanted to

find out whether the mark was already in use, their answer was only a Google search away.

S.C. Johnson points to cases noting that sporadic or *de minimis* use generally may not establish trademark rights. See, *e.g.*, *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1196 (11th Cir. 2001). But these cases are properly understood as ferreting out situations where the use "may indicate the mere intent to reserve a mark for later use rather than the present commercial utilization of the mark." *Allard Enterprises*, 146 F.3d at 359 (discussing *La Société Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265 (2d Cir. 1974)). Such use cannot qualify as "the kind of bona fide use intended to afford a basis for trademark protection." *Id*. (quoting *Le Galion*, 495 F.2d at 1272); see also *Planetary Motion*, 261 F.3d at 1196 (noting that putative owner did not make the product available "merely to a discrete or select group"); *Blue Bell*, 508 F.2d at 1265 (noting that "[s]ecret, undisclosed internal shipments are generally inadequate to support the denomination 'use'").

This does not describe Nutraceutical's use. Even if sales were relatively low, "use" is not limited to sales. Not only did Nutraceutical manufacture and sell BUG OFF products, but it did so through a publicly available website. See *Planetary Motion*, 261 F.3d at 1196 (holding posting of software with mark on publicly available website sufficiently widespread use to establish ownership rights in mark).

Though the record contains little evidence of where sales took place during the post-2012 period, that does not matter. S.C. Johnson's admission that Sunfeather BUG OFF products were sold at "retail shops around the country," together with evidence of the website, does the trick. The website, while

passive, was available nationwide. The district court's deci-sion that Nutraceutical failed to prove post-2012 continuous use was clearly erroneous.

C

While defending the district court's decision with one hand, S.C. Johnson attacks it with the other. S.C. Johnson con-tends that the district court clearly erred in finding that Nutraceutical demonstrated continuing nationwide use be-fore 2012. (We understand it to be making this argument as an alternate ground for supporting the district court's judgment, rather than as an effort to obtain additional relief.)

S.C. Johnson does not challenge any of the district court's underlying factual findings (and that is just as well, given the clear error standard of review that applies to them). We re-view the pertinent findings here. The court found that be-tween 1995 and 1998, Sunfeather's BUG OFF products were advertised, promoted, and sold on Sunfeather's website. It also mailed between 7,500 and 13,333 catalogs annually to customers all across the United States. It marketed and sold BUG OFF products at trade and craft shows across the coun-try. From 1994 through 2004, Sunfeather products bearing the mark were included in Smith & Hawken's catalog, which had a circulation of 200,000 during that period. From 1997 through 2007, they were included biannually in Frontier's catalogs, which were sent to 15,000 wholesalers across the country. Ac-cording to Nutraceutical's sales records, BUG OFF products were sold in 31 states during 2011 and 2012. From 2008–2012, Sunfeather BUG OFF products were sold in the following yearly amounts, and in the following numbers of states:

| Year | Total Unit Sales | States |
|------|------------------|--------|
| 2008 | 3,586 | 35 |
| 2009 | 2,710 | 38 |
| 2010 | 2,032 | 40 |
| 2011 | 944 | 25 |
| 2012 | 501 | 28 |

Although sales certainly declined over this time, Sunfeather BUG OFF products were still being marketed and sold to a nationwide audience. The district court's finding that Nutraceutical demonstrated nationwide, continuing use through 2012 was not clearly erroneous.

### III

The district court abused its discretion when it entertained S.C. Johnson's post-trial argument that Nutraceutical failed to prove continuous use of the BUG OFF mark *after* 2012. Because the district court did not clearly err in finding that Nutraceutical maintained continuous use *prior* to 2012, S.C. Johnson's judgment cannot be saved. We therefore REVERSE and order that the injunction against Nutraceutical be VACATED forthwith.