In the

# United States Court of Appeals
## For the Seventh Circuit

No. 23-2150

OVERWELL HARVEST, LTD., individually and
derivatively on behalf of NEURENSIC, INC.,

*Plaintiff-Appellant,*

*v.*

TRADING TECHNOLOGIES INTERNATIONAL, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-06086 — **Sara L. Ellis**, *Judge.*

ARGUED APRIL 15, 2024 — DECIDED AUGUST 12, 2024

Before KIRSCH, PRYOR, and KOLAR, *Circuit Judges*.

KIRSCH, *Circuit Judge*. Overwell Harvest, Ltd. invested millions of dollars into Neurensic, Inc. Soon after, Neurensic experienced serious financial difficulties, so its management made efforts to sell the company. As its financial circumstances became dire and potential buyers withdrew, Neurensic's board, led by CEO and founder David Widerhorn and COO Paul Giedraitis, accepted an offer from Trading

Technologies International, Inc. In anticipation of the deal closing, Trading Technologies hired former Neurensic employees with Widerhorn and Giedraitis's approval. But, the day before the shareholders' vote on the sale, Overwell made a competing offer. Trading Technologies responded with an increased offer conditioned on the sale closing promptly. Neurensic's board rejected Overwell's offer and went forward with the sale to Trading Technologies. Its shareholders then approved the transaction.

Overwell sued Trading Technologies, alleging that it aided and abetted breaches of fiduciary duties by Widerhorn and Giedraitis. Overwell sought both legal relief (compensatory and punitive damages) and equitable relief (disgorgement of Trading Technologies' benefits from the sale). As the case neared trial, the district court rejected Overwell's jury demand, concluding that it had no right to a jury trial because its aiding and abetting claim was equitable, despite that it sought (in part) legal relief. After a bench trial, the court found for Trading Technologies. Overwell appealed, arguing that the district court erred in denying it a jury trial. We agree with Overwell: though it raised only an equitable claim, because it sought legal relief, it had a right to a jury trial. But because this error was harmless, we affirm.

I

David Widerhorn founded Neurensic, Inc., a Delaware corporation that specialized in market surveillance technology, and served as its CEO. Paul Giedraitis was its COO, and both he and Widerhorn were also directors on its board. Overwell Harvest, Ltd. is a British Virgin Islands company formed solely to invest in Neurensic. Following its initial investment, Overwell provided additional funds after learning from

Widerhorn that Neurensic was having financial difficulties. In return, Overwell received, among other things, a seat on Neurensic's board (becoming the third member). But Neurensic continued to struggle financially, and by summer of 2017, the company was unable to pay rent, service its debt, compensate its employees, or pay taxes on their wages. (Widerhorn was concerned that he would be personally liable for some of these obligations if Neurensic failed.) By August, Neurensic was at or near insolvency, so management sought to quickly find a buyer. After several potential buyers withdrew their interest, only Trading Technologies International, Inc., a Delaware corporation, remained.

On August 17, Widerhorn told shareholders via email that the terms of Trading Technologies' offer were "undesirable" and that management was seeking other offers. But the next day, he sent an email stressing that Neurensic was in such a precarious financial position that it needed to accept an acquisition offer as soon as possible. Widerhorn also asked Neurensic's investors to make a competitive offer within three days, emphasizing that the best option it had at the time was Trading Technologies' offer.

In response to these emails, on August 22, Overwell sued Widerhorn and Giedraitis in federal court under the court's diversity jurisdiction,[*] seeking declaratory and injunctive

---

[*] As this is a derivative suit, the corporation (Neurensic) is considered a plaintiff unless it "is in antagonistic hands," in which case it is considered a defendant. *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 522–23 (1947); *Beck v. Dobrowski*, 559 F.3d 680, 687 (7th Cir. 2009) (If "the management opposes the derivative suit the corporation is treated as a defendant."). Here, because Overwell is "completely and irrevocably opposed"

relief and a temporary restraining order (TRO). Through the TRO, Overwell sought to compel Widerhorn and Giedraitis to both disclose all the material facts of the potential sale to Trading Technologies and to give shareholders notice of those facts 20 days before the shareholder vote on the transaction—as required by 8 Del. C. § 271(a). On August 24, the court granted the motion in part and required Widerhorn and Giedraitis, in the event of an offer to acquire Neurensic, to comply with all disclosure and notice requirements under Delaware law.

Widerhorn pressed forward and, on August 25, sent an email to shareholders explaining that the "only concrete offer" was from Trading Technologies. He explained that management recommended that the shareholders accept the offer given the risk that Neurensic would lose all its key staff and remaining clients if the current financial situation continued. The next day, Trading Technologies sent a term sheet to Neurensic that included a cash payment at closing and post-closing payments. On August 31, a majority of Neurensic's board (Widerhorn and Giedraitis) approved the term sheet.

During the negotiations between Neurensic and Trading Technologies that followed in September, several of Neurensic's former employees began working or agreed to work at Trading Technologies, including Jay Biondo and Morgan Trinkaus. Widerhorn had spoken with Trading Technologies about hiring Biondo and Trinkaus at least as early as September 1. At some point after they began working at Trading Technologies, Biondo and Trinkaus performed client services

to Widerhorn and Giedraitis "on a matter of corporate practice and policy," we treat Neurensic as a defendant, and thus there is complete diversity. *Smith v. Sperling*, 354 U.S. 91, 97 (1957).

for Neurensic. Biondo did so pursuant to an informal agreement between Neurensic and Trading Technologies, but there was no agreement regarding Trinkaus, so Giedraitis told him to stop working with Neurensic clients. There is also evidence that the two prepared and gave a presentation about Neurensic's customer pipeline to Trading Technologies, though they had a contractual obligation with Neurensic to not disclose its confidential information.

Meanwhile, Overwell's suit proceeded. On September 7, the court granted the TRO. It ordered that Widerhorn and Giedraitis "shall take no action with respect to the sale of [Neurensic's] assets unless and until the Board satisfies all applicable requirements of Delaware law" and Neurensic's by-laws.

Trading Technologies sent a revised term sheet to Neurensic on September 11. In relevant part, the term sheet provided that before the transaction closed, Biondo would perform client maintenance services for Neurensic while employed at Trading Technologies. It also outlined, as a closing condition, that Trading Technologies would offer consulting agreements to certain Neurensic employees. Neurensic's board held a meeting on September 14, in which the new terms were discussed. The board also discussed the Neurensic employees who had moved to Trading Technologies. Widerhorn noted that they had been reminded of their confidentiality duties. The board, by a majority, then voted to sell to Trading Technologies under the September 11 terms and scheduled the shareholder vote for October 5. Widerhorn provided shareholders with the requisite 20 days' notice of the meeting and attached the September 11 term sheet to the notice.

On October 3, shortly before the shareholders' meeting, Trading Technologies employees transferred four of Neurensic's servers to Trading Technologies. The servers, similar in size to a pizza box, were moved from Neurensic's storage locker to a locked room at Trading Technologies' office and were password protected. Overwell contends that these servers contained Neurensic's confidential and proprietary information. The servers did not, however, contain the source code for Neurensic's market surveillance product—its most valuable asset.

On October 4, Overwell sent Widerhorn and Giedraitis an offer for Neurensic's assets. The terms included a higher cash payment at closing than Trading Technologies' offer but did not include any post-closing payments and allowed Overwell to walk away without closing after a six week exclusivity period in which Neurensic could not negotiate with other potential buyers. Trading Technologies responded by revising its offer, increasing the cash component to match the sum Overwell offered, keeping the other terms the same, but conditioning the increase on the transaction closing by October 10. Per its discussions with outside counsel, Trading Technologies believed that fiduciary duties required Neurensic's board to accept its revised offer because it ensured a sale, avoiding the risk presented by Overwell's offer that a deal would not close.

Widerhorn and Giedraitis met the morning of October 5 to discuss Overwell's offer. Widerhorn and Giedraitis both perceived a sale to Trading Technologies as superior. They emphasized that Overwell's offer included no post-closing payments and that the exclusivity period would be risky given Neurensic's insolvency. They also stressed that Overwell's

terms did not guarantee its acquisition of Neurensic, so even if they accepted the offer, the transaction might still not close. Widerhorn and Giedraitis voted against accepting Overwell's offer.

The shareholders met in the afternoon. Widerhorn informed them of Overwell's offer and Trading Technologies' proposal to meet Overwell's cash payment, noting that the other terms were identical to those in the September 11 term sheet. Widerhorn then told the shareholders that he believed Trading Technologies' offer to be the better deal, largely because it was guaranteed. No one from Overwell indicated that it would raise its offer in light of Trading Technologies' increased offer. A majority of the shareholders voted to approve the sale of Neurensic to Trading Technologies, and the deal closed.

Overwell then added to its pending complaint a claim against Trading Technologies for aiding and abetting Widerhorn and Giedraitis's breaches of fiduciary duties. It sought compensatory and punitive damages and "all available restitutionary relief, including … disgorgement" of the pecuniary benefits Trading Technologies obtained from acquiring Neurensic's assets. Trading Technologies moved to bar Overwell from seeking disgorgement, arguing that if Overwell could seek such relief, then it had no right to a jury trial. The court denied Trading Technologies' motion to bar disgorgement but concluded that Overwell was not entitled to a jury trial. It applied the two-step inquiry for determining whether an action is a "suit[] at common law" for which the Seventh Amendment guarantees a jury trial. It first found that Overwell's aiding and abetting claim was equitable. It then looked to the relief Overwell requested. It concluded that, because it

sought both legal and equitable relief, its action was more like a suit in equity, not a suit at common law, and thus Overwell had no right to a jury trial on its claim. Trading Technologies also moved to exclude any argument that it was liable for alleged breaches not identified in the court's summary judgment ruling. At the court's request, Overwell filed a list identifying Widerhorn and Giedraitis's breaches of fiduciary duties that Trading Technologies allegedly aided and abetted.

The court conducted a bench trial and entered judgment for Trading Technologies. It found that Overwell waived its arguments that Trading Technologies aided and abetted Widerhorn and Giedraitis in breaching their duties by failing to provide shareholders proper notice of the shareholder vote on Trading Technologies' October 5 offer. Addressing the other alleged breaches, the court concluded that Overwell failed to show, by a preponderance of the evidence, any underlying fiduciary breach by Widerhorn and Giedraitis that Trading Technologies could have aided and abetted. Overwell appealed, arguing only that it was entitled to a jury trial.

## II

We review the district court's determination that Overwell had no right to a jury trial de novo, *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 735 (7th Cir. 2004), and conclude that the district court erred. When a party raising an equitable claim seeks both legal and equitable relief, a district court should allow the case to be presented to a jury. But because the district court's error was harmless, we need not remand for a new trial. *Partee v. Buch*, 28 F.3d 636, 639 (7th Cir. 1994).

A

Under the Seventh Amendment, a right to a jury trial exists in "[s]uits at common law, where the value in controversy shall exceed twenty dollars." Suits at common law include those "in which *legal* rights were to be ascertained and determined," historically brought in English law courts, "in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered," traditionally heard by English courts of equity or admiralty. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 708–09 (1999) (quotation omitted) (emphasis in original). Thus, a party has a right to a jury trial if its case is "more similar to cases that were tried in courts of law than to suits tried in courts of equity or admiralty" in late-18th century England. *Tull v. United States*, 481 U.S. 412, 417 (1987).

The determination of whether a party has a right to jury trial proceeds in two steps: (1) "we compare the … action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity"; and (2) "we examine the remedy sought and determine whether it is legal or equitable in nature." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989) (quotation omitted). But see Samuel L. Bray, *Equity, Law, and the Seventh Amendment*, 100 Tex. L. Rev. 467, 478–80 (2022) (arguing that the Supreme Court is moving away from the two-step approach toward a single inquiry merging the two steps, even though the Court has not explicitly overruled the two-step inquiry). In this inquiry, "characterizing the relief sought is more important than finding a precisely analogous common-law cause of action." *Tull*, 481 U.S. at 421 (cleaned up). In other words, even if a claim is not historically legal, the plaintiff may have a right to a jury trial if

he pursues legal relief. See *Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 573–74 (1990) (holding that, while plaintiffs' "claim include[d] both legal and equitable issues," their demand for a legal remedy meant they were entitled to a jury trial); *Pereira v. Farace*, 413 F.3d 330, 338–41 (2d Cir. 2005) (finding a right to a jury trial on an equitable claim of breach of fiduciary duty where the plaintiff sought only legal relief).

Addressing step one, we agree with the district court that Overwell's claim under Delaware law for aiding and abetting a breach of fiduciary duties is more analogous to actions historically brought in courts of equity. While, in a diversity case such as this, Delaware law controls the "substantive dimension" of the claim, federal law controls "the characterization of that state-created claim as legal or equitable for purposes of whether a right to jury trial is indicated." *Simler v. Conner*, 372 U.S. 221, 222 (1963). A plurality of the Supreme Court has recognized that "action[s] by a trust beneficiary against a trustee for breach of fiduciary duty … were within the exclusive jurisdiction of courts of equity," *Terry*, 494 U.S. at 567, and our sister circuits have held that breach of fiduciary duty claims in the corporate context were historically equitable, e.g., *Pereira*, 413 F.3d at 338; *Bogosian v. Woloohojian Realty Corp.*, 323 F.3d 55, 61 n.4 (1st Cir. 2003). Although this is an aiding and abetting claim, not a pure breach of fiduciary duty claim, "the concept of liability for … aiding and abetting a fiduciary's misconduct comes out of the law of trusts which along with the closely related concept of fiduciary obligation was invented by equity judges." *Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 756 (7th Cir. 1994) (citations omitted). Thus, an aiding and abetting breach of fiduciary duty claim is historically equitable.

At step two, the more important step, we find that Over-
well requested both legal and equitable relief. We evaluate
whether the remedies Overwell sought are legal or equitable
by looking to the "nature of the relief." *Int'l Fin. Servs. Corp.*,
356 F.3d at 736. The compensatory damages sought here were
intended to make Neurensic whole for the money allegedly
lost due to Trading Technologies' misconduct. Such actual
damages, along with punitive damages, are the traditional
forms of legal relief. *Curtis v. Loether*, 415 U.S. 189, 196 (1974).
The disgorgement Overwell pursued is equitable relief. This
is not because Overwell described it as "restitutionary" in the
complaint, see *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477–78
(1962) ("[T]he constitutional right to trial by jury cannot be
made to depend upon the choice of words used in the plead-
ings."), but because the disgorgement was meant to recover
the pecuniary gains Trading Technologies received from its
alleged wrongdoing, see *Liu v. Sec. & Exch. Comm'n*, 591 U.S.
71, 80 (2020) ("[A] remedy tethered to a wrongdoer's net un-
lawful profits, whatever the name, has been a mainstay of eq-
uity courts.").

That Overwell, raising only an equitable claim, pursued
some equitable relief in addition to legal relief cannot, alone,
vitiate its right to a jury trial. That is consistent with the "fed-
eral policy favoring jury trials," *Simler*, 372 U.S. at 222, and the
Court's admonition that the "Seventh Amendment right to a
jury trial applies to all" actions but those "where equitable
rights *alone* were recognized," *Granfinanciera, S.A.*, 492 U.S. at
43–44 (emphasis in original) (quotation omitted). Moreover,
permitting a judge to determine the amount of legal relief
would fly in the face of the long-recognized principle that
such a determination is "peculiarly within the province of the
jury." *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340,

353 (1998) (quotation omitted); *id.* ("[T]here is overwhelming evidence that the consistent practice at common law was for juries to award damages."). So Overwell had a right to present the legal aspects of its case—its entitlement to money damages—to a jury. Cf. *In re PHC, Inc. S'holder Litig.*, 894 F.3d 419, 437 (1st Cir. 2018) (approving, in a case concerning breach of fiduciary duties where the plaintiffs sought money damages and disgorgement, the district court's decision to hold a jury trial on the damages issue).

District courts in this circuit reaching a contrary conclusion have done so by underweighting the need to have juries decide damages—an error the district court carried through in finding that Overwell could not present its case to a jury. In the leading case, *Client Funding Solutions Corp. v. Crim*, 943 F. Supp. 2d 849 (N.D. Ill. 2013), the district court found that there was no right to a jury trial, reasoning that even though the plaintiff sought both legal and equitable relief, the dual nature of the remedies meant that the second step of the *Granfinanciera* inquiry either sat "inconclusively in equipoise" or pointed towards equity because "the requested equitable relief predominates the parties' briefing of the issue." *Id.* at 858. In doing so, it relied heavily on *Cantor v. Perelman*, No. CIV.A. 97-586-KAJ, 2006 WL 318666 (D. Del. Feb. 10, 2006), but that reflected a disregard for *Cantor*'s peculiar facts. In *Cantor*, the plaintiffs sought "the benefits obtained by defendants" as equitable relief in the form of unjust enrichment and, as compensatory damages, "all benefits obtained by defendants as a result of their breaches of fiduciary duty." *Id.* at *2. Thus their "request for relief for unjust enrichment" was "intertwined with the request for compensatory damages." *Id.* at *5. The court concluded that, even assuming the compensatory damages were legal relief, the plaintiffs' mixing of the legal and

equitable relief meant that the legal relief sought was not strictly legal, so there was no right to a jury trial on the equitable breach of fiduciary duty claims. *Id.* at *9. There was no such intertwining of the relief in *Client Funding*. There, the plaintiff sought damages compensating her for the loss caused by the defendant, as well as disgorgement of the benefit she conferred on the defendant, so the reliance on *Cantor* was misplaced and the court should have instead adhered to the principle that legal issues should ordinarily be presented to a jury. 943 F. Supp. 2d at 856–57. And there was no such intertwining here, so the district court should not have looked to *Client Funding* and *Cantor* to find that Overwell had no right to a jury trial.

Simply, unless the plaintiff is not seeking legal relief, its request for some equitable relief is not dispositive of its right to a jury trial on the legal issues in its case. See *Dairy Queen, Inc.*, 369 U.S. at 473 ("[A]ny legal issues for which a trial by jury is timely and properly demanded [must] be submitted to a jury."). And because Overwell sought clear legal relief in addition to equitable relief, the district court erred by barring it from presenting its case to a jury.

B

The district court's error in denying Overwell a jury trial was, however, harmless because Trading Technologies would have been entitled to a directed verdict. *Partee*, 28 F.3d at 639. In a diversity case, the applicable state law supplies the directed verdict standard. *Jackson v. Bunge Corp.*, 40 F.3d 239, 242 (7th Cir. 1994). In Delaware, a directed verdict is warranted if, viewing the record in the light most favorable to the losing party, no jury could find for it "under any reasonable view of

the evidence." *Mercedes-Benz of N. Am. Inc. v. Norman Gershman's Things to Wear, Inc.*, 596 A.2d 1358, 1362 (Del. 1991).

For its aiding and abetting claim, Overwell must establish: (1) "the existence of a fiduciary relationship," (2) "a breach of the fiduciary's duty," (3) "knowing participation in that breach by the defendant[]," and (4) "damages proximately caused by the breach." *RBC Cap. Markets, LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015). "Knowing participation requires both knowledge that the fiduciary is breaching a duty and culpable participation by the aider and abettor." *In re Columbia Pipeline Grp., Inc. Merger Litig.*, 299 A.3d 393, 406–07 (Del. Ch. 2023); see also *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001) (The aider and abettor must "act with the knowledge that the conduct advocated or assisted constitutes such a breach.").

Overwell contends that a reasonable jury could find that Trading Technologies aided and abetted three breaches by Widerhorn and Giedraitis: (1) transferring Neurensic's confidential information, servers, and employees to Trading Technologies before the sale closed; (2) blocking a competitive bidding process for Neurensic's assets; and (3) failing to provide 20 days' notice to shareholders of the terms of the Neurensic sale in violation of 8 Del. C. § 271(a).

But its arguments cannot carry the day. First, Overwell failed to establish that Trading Technologies knowingly participated in a fiduciary duty breach by hiring Neurensic's former employees or obtaining its confidential information because there was no underlying breach by Widerhorn or Giedraitis. Overwell waived its argument regarding the transfer of Neurensic's servers. It mentions this transfer on appeal but does not develop an argument that transferring

the servers shows knowing participation in this alleged breach of fiduciary duty, so we say no more about it. *Bradley v. Vill. of Univ. Park, Ill.*, 59 F.4th 887, 897 (7th Cir. 2023). Second, Trading Technologies did nothing more than sharp elbowed negotiation in seeking to ensure Neurensic would accept its October 5 acquisition offer. That is not enough for knowing participation. Third, we agree with the district court that Overwell waived its § 271 argument.

1

We first address Overwell's allegations premised on the transfer of Neurensic employees and confidential information to Trading Technologies. Fiduciaries of a corporation—directors, officers, and "key managerial personnel"—violate their fiduciary duties by misusing confidential information, *Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962, 965 (Del. 1980), including by using or communicating the corporation's confidential information for their own or a third party's purposes, Restatement (Third) Of Agency § 8.05 (2006). This duty extends to employees who are given confidential information to use for the corporation's purposes. E.g., *Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, C.A. No. 7866-VCP, 2014 WL 897223, at *20 (Del. Ch. Mar. 5, 2014). Even after they leave their positions, such employees, as well as directors, can breach their duties to their former corporation by transacting based on "information acquired during the fiduciary relationship." *Neurvana Med., LLC v. Balt USA, LLC*, C.A. No. 2019-0034-KSJM, 2020 WL 949917, at *10 (Del. Ch. Feb. 27, 2020) (quotation omitted).

Overwell contends that Trading Technologies is liable for aiding and abetting because it hired, with Widerhorn and Giedraitis's permission, former Neurensic employees who

then shared or used Neurensic's confidential information while at Trading Technologies before the transaction closed. It points to the actions of two former employees, Trinkaus and Biondo, who serviced Neurensic's customers with Widerhorn's approval (though Giedraitis later told Trinkaus to stop) and possibly gave a presentation on Neurensic's customer pipeline to Trading Technologies.

First, Biondo and Trinkaus's continued servicing of Neurensic's customers does not show that either they or Widerhorn and Giedraitis breached their fiduciary duties. Again, a fiduciary cannot use a corporation's confidential information for her own or a third party's purposes. Restatement (Third) Of Agency § 8.05 (2006). Even assuming that Biondo and Trinkaus still owed Neurensic a fiduciary duty to not misuse its confidential information after they left, they were not using the information for their own purposes or for Trading Technologies' purposes. They were using it to benefit Neurensic. For example, Biondo testified that the reason Widerhorn encouraged him to continue servicing Neurensic's customers was to prop up the company's value. That is not misusing such information and not a breach. If Biondo and Trinkaus did not breach their duties by using Neurensic's information to service Neurensic's customers while at Trading Technologies, then Widerhorn and Giedraitis did not breach their duties in allowing or urging those employees to do so.

Second, Biondo and Trinkaus's presentation to Trading Technologies on Neurensic's customer pipeline also does not show a breach by Widerhorn or Giedraitis. Assuming the customer pipeline information was confidential and thus that Biondo and Trinkaus breached their duties to Neurensic by giving the presentation (which Trading Technologies

arranged, thereby culpably participating in the breaches), those employees' breaches are not the basis of Overwell's suit. Rather, its suit is premised on breaches by Widerhorn and Giedraitis. And Overwell presented no evidence that Widerhorn or Giedraitis had any knowledge of or involvement with Biondo or Trinkaus giving this presentation. Overwell thus has not established any breach by Widerhorn or Giedraitis related to this presentation of which Trading Technologies could have been aware or in which it participated.

2

Overwell next argues that Trading Technologies caused Widerhorn and Giedraitis to unreasonably cut the bidding process short without seeking another offer from Overwell by: (1) acquiring Neurensic's servers, confidential information, and former employees and thereby leaving Neurensic with nothing of value to sell to another buyer; and (2) telling Widerhorn it would increase the cash component of its offer only if the closing occurred within five days. In Overwell's view, Widerhorn and Giedraitis breached their duty to make a "good faith attempt to secure the highest value reasonably attainable" when the sale of a corporation is impending. *Jervis*, 129 A.3d at 849 (quotation omitted). But there was neither a breach nor knowing participation on Trading Technologies' part.

First, allegations that Widerhorn and Giedraitis transferred Neurensic's servers, confidential information, and former employees to Trading Technologies do not show they rendered the sale to Trading Technologies a foregone conclusion and thereby precluded Neurensic from accepting a better offer in breach of their duties. Overwell does not object to the district court's finding that Trading Technologies neither

accessed Neurensic's servers nor had access to Neurensic's most valuable asset: its source code. It also does not challenge the court's crediting of Giedraitis's testimony that he considered the move temporary. And, given that the servers were not large, Neurensic could have repossessed them without much effort if the deal had not closed. Because Neurensic still had its source code and could take the servers back, the transfer of the servers did not wed Neurensic to a sale to Trading Technologies. And as to the transfer of employees, Overwell made an offer for Neurensic's assets knowing, through its seat on Neurensic's board, that employees had left for Trading Technologies. So Overwell itself believed Neurensic could accept a better offer despite losing these employees. Thus, the record does not support Overwell's contention that Widerhorn and Giedraitis breached their duties by making the Trading Technologies sale a fait accompli.

Second, assuming there was otherwise a breach of the duty to attain the best value, a buyer like Trading Technologies does not knowingly participate in such a breach merely by pursuing its interests aggressively. See *Malpiede*, 780 A.2d at 1097 (noting that a bidder for a company is not liable for aiding and abetting solely because it sought a lower price "through arm's-length negotiations"). It is only when a buyer crosses the line from "hard-nosed bargaining," *Columbia Pipeline Grp.*, 299 A.3d at 476, to "attempts to create or exploit conflicts of interest in the board" or "conspir[ing] in or agree[ing] to the [board's] fiduciary breach" that it can be liable, *Malpiede*, 780 A.2d at 1097–98; see also *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 837 (Del. Ch. 2011) (describing the "long-standing rule that arm's-length bargaining is privileged and does not, absent actual collusion and facilitation of

fiduciary wrongdoing, constitute aiding and abetting") (quotation omitted).

So even if Widerhorn and Giedraitis breached their duties by accepting Trading Technologies' offer and ending the bidding for Neurensic, Overwell did not show that Trading Technologies knowingly participated in that breach. It only established that Trading Technologies was a determined buyer. There is no evidence that Trading Technologies sought to create or exploit any conflicts of interest in the board or encourage a breach of fiduciary duty—let alone that it did so knowingly. Instead, the record shows that Trading Technologies reasonably believed that Widerhorn and Giedraitis would breach their fiduciary duties by rejecting its offer and consequently sought to put pressure on the board to accept it. In an email thread with Trading Technologies' outside counsel the day of the shareholder meeting, its CFO noted that increasing its offer "should make it a non-decision, our bid would be superior in every way," even when conditioned upon a "current signing and closing." And its counsel replied, "The correct answer for a fiduciary decision, which is what that is, will be 'yes.' The alternative is to risk not closing on any deal." Given counsel's advice, Trading Technologies neither knew nor should have known that Widerhorn and Giedraitis would be breaching fiduciary duties (if they even did) by ending bidding and accepting its offer.

The more specific contention that Widerhorn and Giedraitis breached their fiduciary duties by not negotiating a better offer from Overwell also does not demonstrate Trading Technologies' knowing participation. Trading Technologies played no role in the decision to not bargain with Overwell beyond engaging in firm, arms-length negotiation,

which Trading Technologies is "entitled" to do. *Columbia Pipeline Grp.*, 299 A.3d at 478. Overwell suggests that Trading Technologies took advantage of Widerhorn's concerns that he would be personally liable for unpaid wages and taxes and thus exploited a conflict of interest. But Trading Technologies expressly refused to acquire Neurensic's liabilities, so it offered no side benefit or other terms to Widerhorn that would cause him to place his interests above the shareholders'. *Jervis*, 129 A.3d at 862 n.167; see also *Columbia Pipeline Grp.*, 299 A.3d at 407 ("A third-party buyer might create or exacerbate a breach by offering the sell-side fiduciary a side deal."). Instead, because Trading Technologies took Widerhorn as it found him, it could, and did, negotiate aggressively. *Columbia Pipeline Grp.*, 299 A.3d at 478. That is not enough for aiding and abetting liability.

3

Finally, we conclude that Overwell waived its § 271 theory. Overwell asserts that Widerhorn and Giedraitis, aided and abetted by Trading Technologies, violated § 271 by failing to provide Neurensic's shareholders with proper notice of the terms of Trading Technologies' October 5 offer. 8 Del. C. § 271(a) ("Every corporation may at any meeting of its board of directors … sell … all or substantially all of its property and assets … when and as authorized by a resolution adopted by [a majority of the shareholders] … at a meeting duly called upon at least 20 days' notice.").

Overwell neglected to mention this theory until closing arguments, which was too late. *S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*, 835 F.3d 660, 667–68 (7th Cir. 2016) ("[I]ssues for trial are ordinarily limited to those disputed at summary judgment[.]"). Overwell did seek a TRO requiring

Widerhorn and Giedraitis to comply with § 271. But at summary judgment, while Overwell discussed the TRO's mandate that Widerhorn and Giedraitis adhere to the § 271 notice period, it did not contend that they violated § 271. Moreover, recall that the court ordered Overwell to submit a list of the fiduciary breaches it would argue at trial. That list did not mention § 271 or object to the timing of Widerhorn and Giedraitis's disclosure of the transaction's material facts. Rather, it claimed that their disclosure was incomplete. But § 271 does not concern disclosure, only that a sale of a corporation be approved at a meeting of the shareholders and that the shareholders receive 20 days' notice of such a meeting. Overwell therefore waived its final argument supporting its aiding and abetting claim.

AFFIRMED